IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

VINCENT CAMASTRO,

     Plaintiff,

v.                                    Civil Action No. 5:06CV69
                                                      (STAMP)
CITY OF WHEELING and
BARRY CROW, individually and in
his capacity as a City Councilman,

     Defendants.


**MEMORANDUM OPINION AND ORDER
GRANTING AS FRAMED DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT ON PLAINTIFF'S 42 U.S.C. § 1983 CLAIMS
AND DISMISSING WITHOUT PREJUDICE
PLAINTIFF'S STATE CIVIL RIGHTS CLAIMS**

I.  Procedural History

The plaintiff, Vincent Camastro ("Camastro"), initiated the above-styled civil action in this Court against the defendants, the City of Wheeling ("the City") and City Councilman Barry Crow ("Crow"), in his individual and official capacities.  Camastro's original complaint alleged infringement of his First Amendment rights, bringing this action against the City and Crow pursuant to 42 U.S.C. § 1983.  Camastro also alleged intentional interference with economic opportunities and unlawful incitement.  The defendants filed a motion to dismiss.  In response, the plaintiff elected to file a first amended complaint, contemporaneously with his response, pursuant to Federal Rule of Civil Procedure 15(a).

Accordingly, this Court denied without prejudice the defendants'
motion to dismiss.

In his first amended complaint, Camastro eliminated his claims
of intentional interference with economic opportunities and
unlawful incitement. The first amended complaint alleges First
Amendment deprivations and discrimination by the City and Barry
Crow in violation of the United States Constitution; federal law,
42 U.S.C. § 1983; and state law, West Virginia Code § 61-6-21. The
defendants moved for summary judgment. Camastro filed a timely
response, to which the defendants timely replied.

The defendants' motion is now fully briefed and ripe for
review. After reviewing the parties' memoranda and the applicable
law, this Court finds that the defendants' motion for summary
judgment must be granted on the plaintiff's § 1983 claims. Based
upon this Court's rulings on the motion for summary judgment, this
Court will decline to exercise supplemental jurisdiction, and the
plaintiff's state-based civil rights claims will be dismissed
without prejudice.[1]

## II. Facts

Camastro is a small business owner with two enterprises -- the
Grove Terrace Motel and Camastro Advertising -- located in
Wheeling, West Virginia. In addition to these businesses, Camastro

---

[1]This memorandum opinion and order sets forth in more detail
the tentative rulings provided to counsel by letter dated October
9, 2007.

has sought to open a car wash and a video lottery café in Wheeling. This case arises out of two independent communications by city officials concerning signs that Camastro has posted on his property and permits that he has sought for his proposed business endeavors.

The first communication at issue is City Council Member Barry Crow's statement to a local newspaper relating to protest signs that Camastro erected on property he owns in the City. As background, in 1994, the City denied Camastro's application for a variance to build a car wash on one of his properties. Camastro subsequently erected signs on the property to protest the City's decision and other City activities. The signs included the following statements:

> The City of Wheeling has cheated me. They stopped me from building a car wash. I was censored at city council July 5th and not allowed to speak. Look at what they are doing to Wheeling. I was stopped from presenting evidence to a grand jury against corrupt city officials.

(Pl.'s Mem. Opp'n Summ. J. 2.)

In 2001, the City sought an injunction in the Circuit Court of Ohio County, West Virginia, to remove the signs, alleging that they violated city zoning ordinances. Camastro asserted a defense based his First Amendment free speech rights.[2]

Apparently frustrated that the state court had not issued an injunction, Crow, on or about June 10, 2004, publicly expressed his

---

[2]According to the parties, this action remains pending before the state court.

desire that the City remove the signs from Camastro's property.  In the local newspaper, Crow was quoted as saying, "I want the city to take [the signs] down and if [Camastro] wants to, he can take us to court . . . ."  (Compl. Ex. A.)[3]  Within approximately one week of Crow's statements, Camastro's signs were torn down by unidentified individuals.  Camastro admits that his signs had also been knocked down between twenty to sixty times over the years before Crow's public statement.  (Pl.'s Mem. Opp'n Summ. J. 2.)  Camastro claims that, notwithstanding those prior incidents, Crow's comments to the newspaper were intended to and did incite the public to knock down the signs.  Camastro has since replaced the signs, without changing their content, location, or number.

The second communication at issue in this action is a letter dated August 19, 2005 to Camastro from City Solicitor Rosemary Humway-Warmuth.  In her letter, Humway-Warmuth wrote:

> Please be advised that due to your outright inaccurate misstatements, do not contact this department by telephone or in person again.  I will also not respond to the other false allegations and requests made by you in correspondence and shall advise other city departments to similarly respond.

(First Amended Compl. Ex. B.)

Camastro understood this letter as a complete bar to his entering the city building or his contacting city officials.

---

[3]Although Camastro states that Crow also made public comments on a local television broadcast, he has presented no evidence of what was said therein.

Camastro instituted the present suit, contending that the defendants' actions have violated his First Amendment rights to free speech and to petition the government for redress of grievances.  Camastro bases his claims upon 42 U.S.C. § 1983. Specifically, Camastro claims that the defendants (1) violated his free speech rights by retaliating against him for his protest signs when Crow made comments to the press allegedly designed to incite the public to remove plaintiff's protest signs; and (2) infringed upon his right to petition the government when the City Solicitor allegedly barred the plaintiff from communicating with city officials.  .  Camastro submits that the alleged retaliation stems from the "numerous litigations with the City" in which he has engaged over the years "involving zoning and other issues associated with his desire to operate various businesses . . . ." (Pl.'s Br. Opp'n Summ. J. 2.)  Camastro also claims that the defendants violated his state civil rights protections by discriminating against him for his political affiliation, in violation of West Virginia Code § 61-6-21.

### III.  Applicable Law

Under Federal Rule of Civil Procedure 56(c), summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment

as a matter of law." The party seeking summary judgment bears the initial burden of showing the absence of any genuine issues of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). "The burden then shifts to the nonmoving party to come forward with facts sufficient to create a triable issue of fact." Temkin v. Frederick County Comm'rs, 945 F.2d 716, 718 (4th Cir. 1991), cert. denied, 502 U.S. 1095 (1992)(citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986)). However, as the United States Supreme Court noted in Anderson, "Rule 56(e) itself provides that a party opposing a properly supported motion for summary judgment may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." Id. at 256. "The inquiry performed is the threshold inquiry of determining whether there is the need for a trial -- whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Id. at 250; see also Charbonnages de France v. Smith, 597 F.2d 406, 414 (4th Cir. 1979)(Summary judgment "should be granted only in those cases where it is perfectly clear that no issue of fact is involved and inquiry into the facts is not desirable to clarify the application of the law." (citing Stevens v. Howard D. Johnson Co., 181 F.2d 390, 394 (4th Cir. 1950))).

In Celotex, the Court stated that "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322. Summary judgment is not appropriate until after the non-moving party has had sufficient opportunity for discovery. See Oksanen v. Page Mem'l Hosp., 912 F.2d 73, 78 (4th Cir. 1990), cert. denied, 502 U.S. 1074 (1992). In reviewing the supported underlying facts, all inferences must be viewed in the light most favorable to the party opposing the motion. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

## IV. Discussion

A. Subject Matter Jurisdiction Under the Rooker-Feldman Doctrine

The defendants contend that this Court lacks subject matter under the Rooker-Feldman doctrine.[4] They claim that Camastro filed suit in this Court after "numerous dismissals in state court" and that he is effectively seeking appellate review of the state court's judgments. (Df.'s Mem. Supp. Summ. J. 19.) According to

_____

[4]The Rooker-Feldman doctrine derives its name from the two United States Supreme Court cases recognizing the federal district courts' jurisdictional limitations to review final judgments rendered by state courts. See Rooker v. Fidelity Trust Co., 263 U.S. 413 (1923); District of Columbia Court of Appeals v. Feldman, 460 U.S. 462 (1983).

7

the defendants, the state court proceedings reach not only those issues that Camastro has actually raised before that tribunal but also issues that Camastro could litigate but has not. The defendants argue that the precepts of <u>Rooker-Feldman</u> therefore apply to preclude this Court from hearing Camastro's claims.

The Rooker-Feldman doctrine developed out of the United States Supreme Court's exclusive jurisdiction of appeals from state courts' final judgments. <u>See</u> 28 U.S.C. § 1257. Because federal district courts may not exercise appellate jurisdiction over final state court judgments, the <u>Rooker-Feldman</u> doctrine bars federal district court review of "cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." <u>Exxon Mobil Corp. v. Saudi Basic Indus. Corp.</u>, 544 U.S. 280 (2005). The <u>Rooker-Feldman</u> doctrine thus applies to cases in which a state court has rendered a final judgment; the federal plaintiff has lost in state court; the federal plaintiff complains of injuries caused by the state court judgment; the federal plaintiff seeks district court review and reversal of the state court judgment; and the state court rendered its judgment before the federal court proceedings began. <u>Id.</u> Issues that are "inextricably intertwined" with those adjudicated by the state court are also beyond the scope

of district court review.  Id. at 286 (quoting District of Columbia
Court of Appeals v. Feldman, 460 U.S. 462, 486-87 (1983)).

A district court is not, however, barred from "exercising
subject matter jurisdiction simply because a party attempts to
litigate in federal court a matter previously litigated in state
court."  Id. at 293.  A district court may adjudicate "some
independent claim" that a plaintiff raises in federal court, even
if it is "one that denies a legal conclusion that a state court has
reached in a case to which [the plaintiff] was a party . . . ."
Id.  In such a case, the federal court has subject matter
jurisdiction, and the state's laws governing preclusion determine
whether the defendant prevails.  Id.

In this case, the threshold question is whether the state
court has rendered a final judgment on the same -- or inextricably
intertwined -- issues that Camastro seeks to litigate in this
Court.  The defendants maintain that the same issues between the
same parties have already been decided in state court, but the
defendants have neither demonstrated in their pleadings nor made
any filings of proof that the state court has rendered a final
judgment on the same issues before this Court or on issues
inextricably intertwined therewith.[5]    Therefore, this Court

_____

[5]The defendants have filed proof of state court final
judgments on the following issues, none of which presents a Rooker-
Feldman jurisdictional bar to the issues presently before this
Court: (1) whether Camastro's variance application for his car wash
business was wrongly denied by the Board of Zoning Appeals of the

9

concludes that Camastro has raised an independent claim and that
Rooker-Feldman consequently does not bar this Court's exercise of
subject matter jurisdiction to adjudicate Camastro's claims in the
case presently before this Court.[6]

B.  Younger Abstention

The defendants argue that even if the Rooker-Feldman doctrine
does not preclude this Court from exercising subject matter
jurisdiction, this Court must abstain because the same issues
before this Court are already being litigated in state court.
According to the defendants, this Court's exercise of jurisdiction
would unduly intrude upon the state's enforcement and application
of its zoning laws and that Camastro has ample opportunity to
litigate his First Amendment and civil rights claims in the ongoing
state proceedings.  Camastro contends that the arguments and issues

_____

City of Wheeling; (2) whether a city employee committed the tort of
defamation against Camastro by stating that Camastro's building
permit was revoked because he had submitted inaccurate information
in his permit application; (3) whether a preliminary injunction
barring the sale of city-owned property should be granted; (4)
whether the city breached a contract with Camastro for the sale of
land; and (5) whether a writ of mandamus forcing the Board of
Zoning Appeals to hear Camastro's request for a variance should be
granted.  The defendants have also filed proof of two pending state
court actions; in one of those cases, Camastro has argued that the
City has violated his First Amendment rights; however, Rooker-
Feldman does not apply to parallel litigation in state and federal
courts.

[6]Camastro's claim, though it is independent from the issues
present in the state court's final judgments, implicates the issue
of res judicata.  However, the defendants have not raised res
judicata in their pleadings and have, therefore, waived it.

he raises in pending state court actions differ significantly from the claims that are the subject of this suit.

To support their argument for abstention, the defendants rely upon <u>Younger v. Harris</u>, 401 U.S. 37 (1971).  In <u>Younger v. Harris</u>, the United States Supreme Court established a doctrine of equitable restraint on the exercise of subject matter jurisdiction by federal courts in cases where three elements are present: (1) ongoing judicial proceedings are pending in state court when the federal action is initiated; (2) the proceedings involve important state interests; and (3) the state proceedings offer a sufficient opportunity to present and resolve federal claims.[7]  <u>See</u> <u>Employers'</u> <u>Res. Mgmt. Co. v. Shannon</u>, 65 F.3d 1126, 1134-35 (4th Cir. 1995) (citing <u>Middlesex County Ethics Comm. v. Garden State Bar Ass'n</u>, 457 U.S. 423 (1982)).

As Camastro does not dispute that two state court actions were pending at the time that he filed his complaint in federal court on June 7, 2006, the first element of <u>Younger</u> is satisfied.  Further, Camastro does not dispute that both state actions concern the City's zoning ordinances or that, as the United States Court of

---

[7]<u>Younger</u> abstention originally applied only to criminal proceedings, but the United States Supreme Court has extended the doctrine to apply to noncriminal judicial proceedings.  <u>Employers' Res. Mgmt. Co. v. Shannon</u>, 65 F.3d 1126, 1134 n.7 (4th Cir. 1995) (citing <u>Huffman v. Pursue Ltd.</u>, 420 U.S. 592, 603-04 (1975)).  The Court has also broadened the reach of <u>Younger</u> abstention to state administrative proceedings that are judicial in nature.  <u>Id.</u> (citing <u>Ohio Civil Rights Comm'n v. Dayton Christian Sch., Inc.</u>, 477 U.S. 619, 627 (1986)).

Appeals for the Fourth Circuit has observed, "property law concerns, such as land use and zoning questions, are frequently 'important' state interests justifying <u>Younger</u> abstention." <u>Harper v. Public Serv. Comm'n of W. Va.</u>, 396 F.3d 348 (4th Cir. 2005). The state court claims thus clearly involve important state interests. Camastro's federal court claims, however, are distinct from the issues raised in the state judicial proceedings.

One of the pending state court suits is an action filed by Camastro against the City on October 18, 2004, seeking to reverse the Board of Zoning Appeals' decision denying him a variance to expand his billboard business to a nonconforming use. (Def.'s Mem. Supp. Mot. Dismiss Ex. 7.) The defendants have not asserted -- and this Court finds nothing in the parties' filings to indicate -- that Camastro has raised the same or substantially similar civil rights claims in that case as in his federal court case.

The second ongoing state court action, filed by the City against Camastro on October 3, 2001, seeks to enjoin Camastro from posting signs that do not conform to local zoning ordinances. (Def.'s Mem. Supp. Mot. Dismiss Ex. 8.) Camastro has defended the second action on the basis of his First Amendment right to freedom of speech. (First Amended Compl. ¶ 6.) Camastro argues that his claims before this Court concern different First Amendment issues from those he is litigating in the state injunction suit.

The parties' filings in this action support Camastro's position. The parties' filings indicate that, in the state court actions, Camastro is litigating the constitutionality of the zoning ordinances, not the civil rights claims arising from Crow's June 10, 2004 statement to the press and from Humway-Warmuth's August 19, 2005 letter, which are the subject of this suit.

Even though the City's refusal to grant Camastro certain permits for particular business ventures may be the genesis of Camastro's litigation in both federal court and state court, the limited information provided to this Court concerning the state court actions offers no evidence that Camastro or the defendants raise the same, or sufficiently similar, matters in the state court proceedings as the issues that are the subject of this suit.[8] Had they done so, the defendants might have a stronger Younger argument. The record before this Court fails to demonstrate that Camastro's federal court action involves important state interests or that this Court's adjudicating those claims would interfere with the pending state suits or with the important state interests raised therein. This Court can decide whether the plaintiff has a valid retaliation claim under § 1983 in the two discrete instances

---

[8]Plaintiff's counsel in his reply brief does say that "The instant case grows out the defendant's failure to allow the injunctive action to run its course . . . ." (Pl.'s Br. Opp'n Summ. J. 27.) Although this statement could arguably mean that the two claims before this Court could be considered as part of the injunction suit in state court, it does not, without more, constitute sufficient grounds to abstain under Younger.

that are the subject of this suit without intruding upon the state court's parallel proceedings on whether to enjoin the plaintiff from alleged violations of the City's zoning code.[9] Accordingly, this Court finds that dismissal of Camastro's suit under <u>Younger</u> abstention is not warranted.[10]

C.     <u>Application of the Colorado River Doctrine</u>

The defendants further argue that this Court should dismiss Camastro's claims under the <u>Colorado River</u> doctrine, which permits federal courts to stay or dismiss a case over which the courts have federal question jurisdiction where pending parallel state proceedings raise the identical issues. <u>Colorado River Conservation Dist. v. United States</u>, 424 U.S. 800 (1976). The <u>Colorado River</u> doctrine is not a doctrine of abstention, which is based upon the principles of federalism and comity for state relations; rather, it is a doctrine resting upon considerations of judicial economy and "wise judicial administration." <u>Id.</u> at 813. For this reason, courts should apply the <u>Colorado River</u> doctrine only in exceptional circumstances. <u>Id.</u> at 818.

---

[9]For purposes of this opinion only, this Court assumes, without deciding, that the zoning provisions are constitutional.

[10]In a federal claim seeking monetary damages, such as Camastro's § 1983 action, a federal court may stay proceedings rather than dismiss the action outright. <u>See</u> <u>Gilbertson v. Albright</u>, 381 F.3d 965, 984 (9th Cir. 2004)(en banc). However, neither party has requested a stay; therefore, this Court does not reach this issue.

The United States Court of Appeals for the Fourth Circuit has summarized the approach for applying the <u>Colorado River</u> doctrine:

> The threshold question in deciding whether *Colorado River* abstention is appropriate is whether there are parallel federal and state suits. If parallel suits exist, then a district court must carefully balance several factors, with the balance heavily weighted in favor of the exercise of jurisdiction. Although the prescribed analysis is not a hard-and-fast one in which application of a checklist dictates the outcome, six factors have been identified to guide the analysis: (1) whether the subject matter of the litigation involves property where the first court may assume *in rem* jurisdiction to the exclusion of others; (2) whether the federal forum is an inconvenient one; (3) the desirability of avoiding piecemeal litigation; (4) the relevant order in which the courts obtained jurisdiction and the progress achieved in each action; (5) whether state law or federal law provides the rule of decision on the merits; and (6) the adequacy of the state proceeding to protect the parties' rights. In the end, however, abstention should be the exception, not the rule, and it may be considered only when the parallel state-court litigation will be an adequate vehicle for the complete and prompt resolution of the issues between the parties.

<u>Chase Brexton Health Services, Inc. v. Maryland</u>, 411 F.3d 457, 463-64 (4th Cir. 2005)(internal quotations and citations omitted).

Following the Fourth Circuit's analysis in <u>Chase Brexton</u>, this Court must first determine whether the state and federal actions are sufficiently similar to constitute parallel proceedings before weighing the <u>Colorado River</u> factors to decide whether to dismiss this case.[11] As discussed above, on the record before it, this Court is unable to conclude that the state court proceedings

---

[11]As neither party has requested a stay pursuant to the <u>Colorado River</u> doctrine, this Court determines only whether that doctrine counsels dismissal.

involve the same or similar issues as the federal court claims. Further, no evidence on the record supports a conclusion that a strong federal policy exists for trying all of Camastro's claims in state court. Accordingly, on the record before it, this Court finds that the federal and pending state actions do not constitute parallel proceedings and that therefore dismissal under the Colorado River doctrine is inappropriate.

Having determined that the Rooker-Feldman doctrine does not bar this Court's exercise of subject matter jurisdiction, that Younger abstention is unwarranted, and that dismissal under the Colorado River doctrine is inappropriate, this Court now turns to the merits of Camastro's claims.

D.    Federal Civil Rights Claim Under 42 U.S.C. § 1983

The defendants claim that Camastro has suffered no deprivation of his First Amendment rights free speech and petition of the government because he has continued to exercise both rights since the time of the conduct giving rise to this action. Therefore, the defendants assert, Camastro has suffered no violation of his § 1983 civil rights and these claims must be dismissed. Camastro responds that the conduct of Crow and the City Solicitor violates his First Amendment rights regardless of whether he ceased exercising those rights and that the City and Crow are therefore liable under § 1983.

1.    Free Speech Claims

The defendants contend that summary judgment should be granted in their favor on Camastro's § 1983 free speech claims for three reasons. First, the defendants point out that Camastro replaced the signs that were knocked down and that the replacement signs, which are the same in number, content, and location as those which were torn down, remain standing. That Camastro's protest signs have been re-erected, the defendants claim, indicates that no chilling of free speech has occurred.

Second, they maintain that Crow's statements to the press were not directed to the public as a means of inciting the community to tear down Camastro's signs. According to the defendants, Crow's statements merely expressed his own view that the City, pursuant to its authority under § 1359.09(b) of the Codified Ordinances of the City of Wheeling, should remove the signs, which, the defendants maintain, do not conform to local ordinances and for which Camastro had obtained no permits. The defendants also assert that Crow was exercising his free speech rights and that therefore his statements to the press concerning Camastro's protest signs are fully protected by the First Amendment.

Finally, the defendants argue that Camastro cannot demonstrate a causal link between Crow's statements and the knocking down of Camastro's signs. To support this argument, the defendants state that because the signs had been torn down on numerous occasions before Crow made his statements and because the first occasion on

which the signs were knocked down thereafter occurred at least one week later, Camastro cannot demonstrate that Crow's statements caused the subsequent tearing down of the protest signs.

Camastro argues in response that his re-erecting the protest signs is immaterial to his First Amendment claim because the defendants' conduct would tend to chill the freedom of expression of a person of ordinary firmness. In support of his argument, Camastro relies upon Constantine v. Rectors & Visitors of George Mason Univ., 411 F.3d 474 (4th Cir. 2005). In that case, the United States Court of Appeals for the Fourth Circuit observed that the First Amendment protects both the affirmative right to speak "'and the right to be free from retaliation by a public official for the exercise of that right.'" Constantine, 411 F.3d at 499 (quoting Suarez Corp. Indus. v. McGraw, 202 F.3d 676, 685 (4th Cir. 2000)). A plaintiff need not, however, prove that the allegedly retaliatory conduct caused complete cessation of the protected speech, but rather that such conduct would tend to chill the First Amendment activity of a person of ordinary firmness. Id. at 500. According to the law of the Fourth Circuit,

> [a] plaintiff seeking to recover for First Amendment retaliation must allege that (1) she engaged in protected First Amendment activity, (2) the defendants took some action that adversely affected her First Amendment rights, and (3) there was a causal relationship between her protected activity and the defendants' conduct.

Constantine, 411 F.3d at 499.

Even if this Court assumes, without deciding, that Camastro's protest signs are legally protected by the First Amendment, Crow, as a City Council Member, also has a First Amendment right to speak on matters of public interest. More importantly, Crow's comments to the press cannot be reasonably construed as directing the public to tear down Camastro's signs; rather, the comments were clearly directed to city government to take official action to remove the signs. Additionally, because the signs were frequently knocked down by unidentified individuals before Crow made his comments, and because there is no evidence, other than hearsay, that city employees took the signs down, Crow's statements lack the requisite nexus to the tearing down of Camastro's signs to demonstrate that the statements adversely affected Camastro's First Amendment rights. Finally, Camastro has replaced the signs, which remain in place. He has therefore not demonstrated any chilling of his free speech rights, nor has he offered any evidence to demonstrate that a person of ordinary firmness would have been dissuaded from exercising the right to free speech. Because Camastro cannot demonstrate that Crow's actions adversely affected his free speech rights, his free speech claims against both Crow and the City must fail.

This Court observes that even if Crow's actions had chilled Camastro's speech or would have chilled the speech of a person of ordinary firmness, Camastro's claims against the City would still

fail because Crow, acting alone, has no authority to make final policy decisions on behalf of the City. See City of St. Louis v. Prapotnik, 485 U.S. 112, 127 (1988). Title 42, United States Code, Section 1983 provides redress for state action which deprives a citizen of a right, privilege or immunity ensured by the Constitution or law of the United States. See 42 U.S.C. § 1983. To constitute a § 1983 violation, the conduct complained of must be made under color of law; to constitute a constitutional violation, the conduct complained of must be state action. For purposes of a § 1983 action instituted against a state or local official for First Amendment violations, conduct that "satisf[ies] the state-action requirement of the of the Fourteenth Amendment satisfies the statutory requirement of action under color of state law." Lugar v. Edmondson Oil Co., Inc., 457 U.S. 922 (1982).

The United States Supreme Court has established that a city may be held liable for constitutional violations only if such violations result from the city's official policies and customs. See Monell v. Dep't of Social Services, 436 U.S. 658, 661 (1978), which include the following: actions of municipal legislative bodies, see Pembaur v. City of Cincinnati, 475 U.S. 469, 480 (1986); action by agencies exercising delegated authority, see Monell, 436 U.S. at 661; and actions by individuals with final policy-making authority concerning the subject matter in question;

see Pembaur, 475 U.S. at 483-84.[12]  State law determines the policy-making status of a state or local official.  See City of St. Louis v. Praprotnik, 485 U.S. 112, 124 (1988).  Whether state law confers policy-making authority upon a state or local official is a question of law for the court to decide.  Id.

To determine whether a particular official or employee has authority to make policy, courts may rely upon the state's relevant positive law, as well as relevant custom and practice.  Id. at 124 n.1.  Under West Virginia law, "any city may by charter provision . . . determine and prescribe the . . . powers and duties of municipal officers and employees . . . ."  W. Va. Code § 8-5-11. The Charter of the City of Wheeling, West Virginia, Section 3, provides, in pertinent part:

> All legislative powers of the City shall be vested, subject to the terms of this Charter and of the Constitution of the State, in the Council.  The Council shall have authority to pass all ordinances necessary and proper to carry into full force and effect any power, capacity, authority, or jurisdiction which is or shall be granted to or fixed in the City or in the Council or in any officer of the City, and to provide for the enforcement of any or all of their ordinances by reasonable fines and penalties . . . .

Wheeling, W. Va., City Charter § 3.

The City's Charter clearly contemplates that final policy-making authority for the City resides in the Council as a body, not

---

[12]State action may also lie where a state or local government has failed to train, supervise, or discipline its employees.  See City of Oklahoma v. Tuttle, 471 U.S. 808 (1985).

in individual council members. Absent custom indicating otherwise, which Camastro has not pled, nothing in the City's Charter, nor in the relevant code section, suggests that the City has a policy of permitting individual council members to incite the public to remove signs that allegedly violate the City's zoning ordinances. See Wheeling, W. Va., Codified Ordinances, Part 13 (1984). Therefore, this Court finds that even if Crow's action chilled Camastro's speech, or would have chilled the speech of a person of ordinary firmness, the City of Wheeling could not be held liable because Crow does not have final policy-making authority for the City.

    2.   Right to Petition Claims

    The defendants contend that their motion for summary judgment should be granted as to Camastro's § 1983 claim that the August 19, 2005 letter from the City Solicitor infringed upon his First Amendment right to petition the government. The defendants advance two arguments in support of this contention. First, they claim that the City Solicitor's letter did not constitute official policy of the City. Second, they observe that Camastro continues to communicate with City officials. In response, Camastro advances the same arguments as he asserted for his free speech claims. Additionally, Camastro refers to the City Solicitor as "City Solicitor and/or decision maker" in his brief opposing defendants' motion for summary judgment, thus implying an assertion that the

City Solicitor has policy-making authority. (Pl.'s Br. Opp'n Mot. Summ. J. 6.)

As discussed above, a city is liable for constitutional violations, pursuant to 42 U.S.C. § 1983, only when the city official or employee acts on the basis of his or her final policy-making authority. The City Solicitor of Wheeling has no such authority. The Charter of the City of Wheeling, West Virginia, Section 48 describes the powers and duties of the City Solicitor. Section 48 provides, in pertinent part:

> The solicitor shall serve the Council, officers, commissioners, and Boards of the City as legal counsel and attorney, and shall represent the City in all proceedings in court. The solicitor shall act as Prosecuting Attorney in Municipal Court and in reference to all appeals from that Court, and shall perform all other duties which the Council may impose consistent with the office.

Wheeling, W. Va., City Charter § 48.

The City of Wheeling Administrative Code Article 129 describes additional duties of the City Solicitor as head of the Legal Department. According to Art. 129.02, the Legal Department is responsible for advising and assisting in the preparation of ordinances and rules; advising administrative and legislative officers of the City on the legality of any proposed action; prosecuting all criminal actions brought by the City; representing the City as attorney in all legal proceedings in which the City is a party; and performing other duties as may prescribed by law. See Wheeling, W. Va., Admin. Code art. 129.02 (1961). The City

Solicitor also has limited authority to settle or compromise claims or suits to which the City is a party. Id., art 129.03.

Nothing in the City's Charter or relevant code sections suggests that the City Solicitor has the authority to make policy decisions on behalf of the City. This Court finds that the City Solicitor does not have policy-making authority and therefore her letter dated August 19, 2005 does not constitute state action or action under color of law. For this reason, Camastro's § 1983 claim against the City alleging violation of his right to petition the government must fail.

E. State Civil Rights Claim Under West Virginia Code § 61-6-21

Camastro alleges that the defendants discriminated against him on the basis of his political affiliation, in violation of civil rights protections afforded by the West Virginia Civil Rights Act. See W. Va. Code § 61-6-21. As this claim is based solely on West Virginia law, and as this Court has determined that Camastro's federal claims must be dismissed, this Court declines to exercise supplemental jurisdiction over the state law claim, pursuant to 28 U.S.C. § 1367(c)(3), and this claim will be dismissed without prejudice.

V. Conclusion

For the above stated reasons, the defendants' motion for summary judgment on the plaintiff's 42 U.S.C. § 1983 claims is

GRANTED, and the plaintiff's state civil rights claim is DISMISSED WITHOUT PREJUDICE.

IT IS SO ORDERED.

The Clerk is DIRECTED to transmit a copy of this memorandum opinion and order to counsel of record herein. Pursuant to Federal Rule of Civil Procedure 58, the Clerk is DIRECTED to enter judgment on this matter.

DATED:    October 23, 2007


/s/ Frederick P. Stamp, Jr.
FREDERICK P. STAMP, JR.
UNITED STATES DISTRICT JUDGE